**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE**


Casandra Day

    v.

Daniel Hurley, individually
and officially; Kyle Macie,
individually and officially;
Ken Meola, individually and
officially; City of Keene, NH

Civil No. 12-cv-317-LM
Opinion No. 2014 DNH 099


**O R D E R**

Casandra Day has sued in ten counts, asserting federal and
state claims against four defendants.  Her claims arise out of
an incident in which two officers of the Keene Police Department
("KPD"), Daniel Hurley and Kyle Macie, responded to a 911 call
made on Day's behalf.  She asserts federal claims, by means of
42 U.S.C. § 1983, for: use of excessive force (Count I),
unlawful detention (Count II), and negligent training and
supervision (Counts III and IV).  She also asserts state-law
claims for: assault (Count V), battery (Count VI), intentional
infliction of emotional distress (Count VII), and false
imprisonment (Count X).[1]  Before the court is defendants' motion

---

[1] Counts VIII and IX do not assert causes of action but,
rather, impute liability for the allegedly tortious conduct of
Officers Hurley and Macie to Chief Ken Meola of the KPD and to
the Town of Keene.

for summary judgment on all counts.  Day objects.  The court
heard oral argument on defendants' motion on April 25, 2014.
For the reasons that follow, defendants' motion for summary
judgment is granted.

## Summary Judgment Standard

"Summary judgment is appropriate when there is no genuine
issue of material fact and the moving party is entitled to
judgment as a matter of law." Ponte v. Steelcase Inc., 741 F.3d
310, 319 (1st Cir. 2014) (quoting Cortés–Rivera v. Dept. of
Corr., 626 F.3d 21, 26 (1st Cir. 2010)); see also Fed. R. Civ.
P. 56(a).  "The object of summary judgment is to 'pierce the
boilerplate of the pleadings and assay the parties' proof in
order to determine whether trial is actually required.'" Dávila
v. Corp. de P.R. para la Diffusión Púb., 498 F.3d 9, 12 (1st
Cir. 2007) (quoting Acosta v. Ames Dep't Stores, Inc., 386 F.3d
5, 7 (1st Cir. 2004)).

When ruling on a motion for summary judgment, the court
must "view[] the entire record 'in the light most hospitable to
the party opposing summary judgment, indulging all reasonable
inferences in that party's favor.'" Winslow v. Aroostook Cty.,
736 F.3d 23, 29 (1st Cir. 2013) (quoting Suarez v. Pueblo Int'l,
Inc., 229 F.3d 49, 53 (1st Cir. 2000)).

"The nonmovant may defeat a summary judgment motion by demonstrating, through submissions of evidentiary quality, that a trialworthy issue persists." Sánchez-Rodríguez v. AT&T Mobility P.R., Inc., 673 F.3d 1, 9 (1st Cir. 2012) (quoting Iverson v. City of Boston, 452 F.3d 94, 98 (1st Cir. 2006)). That is, "the party seeking to avoid summary judgment must be able to point to specific, competent evidence to support his [or her] claim." Sánchez-Rodríguez, 673 F.3d at 9 (quoting Soto-Ocasio v. Fed. Ex. Corp., 150 F.3d 14, 18 (1st Cir. 1998)) (internal quotation marks omitted).

## Background

Unless otherwise indicated, the following facts are undisputed. On May 9, 2010, at 8:38 pm, Day's boyfriend, Edwin Martinez, called 911 to report that Day was having an asthma attack and needed medical assistance. He told the 911 operator that if police officers approached Day with lights and sirens, she would run from them. At 8:42, a 911 operator notified KPD dispatch that an ambulance was being sent to Day's location, and requested police assistance. The KPD dispatch log describes the situation as follows: "38 [year old] female asthma attack and anxiety attack. She is in a white Explorer and reported that she will run if 911 is called." Defs.' Redacted Mem. of Law,

Ex. 4 (doc. no. 16-5).  Officer Macie was dispatched to the

scene, and arrived at 8:46:06.  Officer Hurley was also

dispatched to the scene, and arrived at 8:47:10.  The ambulance

arrived at 8:48:08, and the paramedics began treating Day at

8:49:00.  Thus, her medical treatment began less than three

minutes after the first police officer arrived on the scene,

less than two minutes after Officer Hurley arrived, and less

than one minute after the ambulance arrived.

In his report on the incident, Officer Macie stated, in

pertinent part:

Dispatch advised that the person in need of medical
assistance would run if she saw an ambulance so the
police were also being asked for.

When I pulled into the parking lot I was flagged down
by a male subject.  . . .  Just as I pulled up to him
a female exited a white ford explorer, which was
parked, and [she] began to run across the parking lot.
Officer Hurley, who also just arrived caught up to her
and attempted to speak with her.  Officer Hurley tried
to calm the female, Casandra Day,[2] but she was yelling
and waving her arms so much that she did not calm
down.  Officer Hurley grabbed Casandra by her right
arm and began to walk her back toward our cruisers to
await the arrival of the ambulance.

Just as Officer Hurley and Casandra arrived at the
cruiser Casandra attempted to spin around and punch
Officer Hurley.  Seeing this move, Officer Hurley
grabbed Casandra with both of his hands and placed her
into an arm bar and then leaned her on the trunk of

_____

[2] In both Officer Macie's report and Officer Hurley's
report, which is quoted below, the court has corrected the
spelling of Day's first name.

4

> the cruiser.  Even with the arm bar in place Casandra
> continued to yell and scream and attempt to get out of
> the arm bar.  Eventually she got tired and gave up.
>
> When the Fire Department arrived Casandra calmed down
> and agreed to receive medical attention.

Defs.' Redacted Mem. of Law, Ex. 7 (doc. no. 16-8).  For her

part, Day has produced evidence that: (1) when she first saw

Officer Hurley, she "started walking fast," Pl.'s Mem. of Law,

Ex. A, Martinez Dep. (doc. no. 21-2) 24:4, Feb. 6, 2012; see

also id. at 43:19; (2) during her encounter with Officer Hurley,

she flailed her arms at him and yelled, see id. 17:14-18, 31:8-

13, 50:7-51:5; and (3) while Officer Hurley had her in an arm

bar, she was screaming, see id. at 30:4, and acting in a way

that prompted Martinez "to tell her [to] calm down," id. at

30:5-6.

In his report, Officer Hurley describes his interaction

with Day this way:

> Dispatch[] advised that the female who was later
> identified as Casandra Day was threatening to run away
> from the ambulance upon their arrival.
>
> We arrived on scene and I observed a male . . .
> standing outside a white ford explorer.  Casandra was
> seated in the driver seat of the explorer.  As I
> exited my cruiser I observed Casandra running from her
> vehicle and Edwin was chasing her.
>
> Casandra and Edwin stopped in the parking lot . . . .
> They were standing toe to toe and Casandra was yelling
> at the top of her lungs and was flailing her arms.

. . .  Edwin was asking Casandra to calm down and she
was yelling back at him "Don't Tell Me to Calm Down"!

[I'm] thinking that Casandra may hit Edwin or continue
to run away[.]  I walked up to her [and] asked her to
calm down and placed my right hand onto Casandra's
right bicep and started to escort her back to one [of]
the cruisers.  . . .

While I was escorting Casandra over to the cruiser she
continued to yell and flail her arms.  I brought
Casandra over to the trunk of one of the cruisers.
Casandra then used her free left hand, made a fist[,]
raised it above her head and swung it in my direction
and missed.

I then shifted my hand position from the escort
position to the arm bar.  I placed Casandra on the
trunk of the cruiser.  I told Casandra that she was
not under arrest and that she should not give me a
reason to arrest her.  I had a slight grip on her at
this time.  Casandra continued to yell and twist her
upper body for a short period of time until it
appeared she became too out of breath[] to struggle.
. . .

The Keene Fire Department[']s EMT's were standing at
my cruiser and I told Casandra that the ambulance was
here and that she should allow the EMT's to check her
condition.  I completely let go of Casandra at [t]his
time.

Defs.' Redacted Mem. of Law, Ex. 6 (doc. no. 16-7), at 1.  Day

has produced evidence that before Officer Hurley approached her,

she was yelling at Edwin.  See Pl.'s Mem. of Law, Ex. B, Day

Dep. (doc. no. 21-3) 32:23-33:4, Feb. 6, 2012.

As noted, there is undisputed evidence that while Day was

in Hurley's control, Martinez felt the need to tell her to calm

down.  Both Day and Martinez testified that Officer Hurley let

Day go once she submitted to him, see Day Dep. 50:20-21;
Martinez Dep. 33:1-2, and Martinez testified that "[i]t took her
a while" to do so, id. at 33:5.  Because Day herself has
produced evidence that Officer Hurley released her to the
paramedics once she submitted to him, it would not be reasonable
for the court to infer that she was, at all times, compliant
with Officer Hurley's instructions.  Accordingly, it does not
offend the principles of summary-judgment jurisprudence for the
court to deem it undisputed that, for at least some portion of
her encounter with Officer Hurley, Day was not cooperative with
him.

     As for Officer Macie's involvement, Day has produced
evidence that, when Officer Hurley grabbed her, Officer Macie
"was there but not in the scene as of yet."  Martinez Dep. 30:7.
There is also evidence that: (1) Martinez pleaded with both
Officers Hurley and Macie to let Day go, see id. at 33:12-13,
44:8-11; (2) Day begged Officer Macie to tell Officer Hurley to
let her go, see Day Dep. 47:1-4, 48:23-49-2, 50:13-15, 55:20-21;
and (3) Officer Macie responded to Day by asking her whether she
was going to cooperate, see id. at 50:1-2.

     Finally, in the narrative portion of an Out of Hospital
Care Report completed by one of the paramedics who treated Day,
he described the scene upon his arrival this way: "38 y/o female

subject was found . . . being physically detained by two KPD Officers, as female subject was quite excitable and being uncooperative." Defs.' Redacted Mem. of Law, Ex. 5 (doc. no. 16-6), at 2.

In addition to the foregoing, Day has produced evidence that: (1) at the time of the incident, she was unable to run, see Day Dep. 40:17-19, 41:8-10, and did not run from Officer Hurley, see Martinez Dep. 14:20-23; (2) she never made a fist or swung at Officer Hurley, see Day Dep. 47:4-15, 48:2-11, 56:18-22; and (3) Martinez never saw her do so, see Martinez Dep. 30:18-31:7, 32:19-23. In support of the proposition that she was not being uncooperative while she was being detained by Officer Hurley, Day has produced evidence that when Officer Hurley had her in an arm bar, she reacted by begging him to let her go because she was in pain, see id. at 30:4-5, and trying to explain her physical condition to him, see id. at 33:5-13.

### Discussion

The court begins with Day's federal claims and then turns to her claims under the common law of New Hampshire. Moreover, the court takes Counts I and II out of order, given that Count II is a claim that Officers Hurley and Macie violated Day's Fourth Amendment rights by detaining her at all, while Count I

is a claim that the officers violated her Fourth Amendment
rights by using excessive force against her during her
detention.

### A. Count II

In Count II, Day claims that Officers Hurley and Macie
violated her rights under the Fourth Amendment to the United
States Constitution by detaining her without legal
justification.  Defendants argue that: (1) Officer Macie is
entitled to summary judgment on Count II because he did not do
anything to detain Day; and (2) Officer Hurley's actions were
reasonable in the context of his performance of a community-
caretaking function.  Day contends that her detention was an
unlawful seizure because: (1) Officers Hurley and Macie lacked
reasonable suspicion or probable cause to believe that she was
committing, had committed, or was about to commit a crime; and
(2) Officer Hurley was not properly engaged in community
caretaking when he detained her.  The court begins with the
relevant law and then turns to the claims against each of the
two officers.

### 1. Relevant Law

"A detention at the hands of a police officer constitutes a
seizure of the detainee's person and, thus, must be adequately
justified under the Fourth Amendment."  Morelli v. Webster, 552

F.3d 12, 19 (1st Cir. 2009) (citing United States v. Romain, 393
F.3d 63, 70-71 (1st Cir. 2004)).  After stating that general
principle, Morelli goes on to describe the probable-cause
standard necessary to make an arrest, see 552 F.3d at 19
(citation omitted), and the reasonable-suspicion standard that
applies to investigatory stops, see id. (citation omitted).
This case, however, involves neither an arrest nor an
investigatory stop; rather, as defendants suggest, Day was
detained by an officer performing a community-caretaking
function.

    The court of appeals for this circuit has described the
community-caretaking function in the following way:

> The policeman plays a rather special role in our
> society; in addition to being an enforcer of the
> criminal law, he is a "jack-of-all-emergencies," W.
> LaFave, Search and Seizure § 5.4(c) (2d ed. 1987),
> expected to aid those in distress, combat actual
> hazards, prevent potential hazards from materializing,
> and provide an infinite variety of services to
> preserve and protect community safety.  Recognition of
> this multifaceted role led to the Court's coinage of
> the "community caretaking" label in Cady v.
> Dombrowski, 413 U.S. 433 (1973).  The rubric is a
> catchall for the wide range of responsibilities that
> police officers must discharge aside from their
> criminal enforcement activities.  See id. at 441.

United States v. Rodriguez-Morales, 929 F.2d 780, 784-85 (1st
Cir. 1991) (parallel citations omitted).  Moreover, "under the
community caretaking doctrine, [a] police action can be

constitutional notwithstanding the fact that it constitutes a seizure." Lockhart-Bembery v. Sauro, 498 F.3d 69, 75 (1st Cir. 2007) (citation omitted).

Indeed, "[o]ne situation in which an officer may act under the community caretaker doctrine is when 'the officer has a reasonable belief that an emergency exists requiring his or her attention.'" United States v. Harris, ___ F.3d ___, ___, 2014 WL 1356822, at *3 (8th Cir. Apr. 4, 2014) (quoting Burke v. Sullivan, 677 F.3d 367, 371 (8th Cir. 2012) (other citations omitted); see also Samuelson v. City of New Ulm, 455 F.3d 871, 877 (8th Cir. 2006) (explaining that community-caretaking function "include[s] seizing a citizen 'in order to ensure the safety of the public and/or the individual, regardless of any suspected criminal activity.'") (quoting Winters v. Adams, 254 F.3d 758, 763 (8th Cir. 2001)).  Not only are police officers permitted to seize citizens in the course of performing their duties as community caretakers; they are expected to do so when circumstances call for such a response.  See Samuelson, 455 F.3d at 877; cf. Lewry v. Town of Standish, 984 F.2d 25, 28 (1st Cir. 1993) (stating, in case where plaintiff sued police officer for false arrest after officer found plaintiff "weaving drunkenly" on roadside and drove him home: "We must observe that we think

this claim a fuss about nothing.  Was plaintiff to be left on
the highway?").

Regarding the application of Fourth Amendment principles to
community caretaking, the Lockhart-Bembery court explained:

> The imperatives of the Fourth Amendment are
> satisfied in connection with the performance of non-
> investigatory duties, including community caretaking
> tasks, so long as the procedure involved and its
> implementation are reasonable.  [Rodriguez-Morales,
> 929 F.2d at 785.]  The community caretaking doctrine
> gives officers a great deal of flexibility in how they
> carry out their community caretaking function.  See
> id.  The ultimate inquiry is whether, under the
> circumstances, the officer acted "within the realm of
> reason."  Id. at 786.  Reasonableness does not depend
> on any particular factor; the court must take into
> account the various facts of the case at hand.  See
> [United States v.] Coccia, 446 F.3d [233] 239-40 [(1st
> Cir. 2006)].

498 F.3d at 75 (citation omitted).[3]

In Rodriguez-Morales, the court of appeals sketched the
broad outlines of the relevant reasonableness inquiry:

> The inquiry into reasonableness always necessitates
> constructing a balance among competing interests.  See
> Delaware v. Prouse, 440 U.S. 648, 654 (1979) (fourth
> amendment reasonableness inquiry involves balancing
> legitimate government interests against intrusion on
> individual's rights); Lopez Lopez v. Aran, 844 F.2d
> 898, 905 (1st Cir. 1988) (in determining reasonable-
> ness, "judges must weigh the need to search or seize
> against the invasion the search or seizure entails").

---

[3] At least two courts have opined that "investigative
detentions and community caretaking detentions are effectively
subject to the same standards."  United States v. Thomas, 434 F.
App'x 725, 728 n.2 (10th Cir. 2011) (citing United States v.
Garner, 416 F.3d 1208, 1213 (10th Cir. 2005)).

12

In the community caretaker cases, we believe that this
"search for equipoise," Lopez Lopez, 844 F.2d at 905,
almost always involves the exercise of discretion.

929 F.2d at 786-87 (parallel citations omitted).  The 8th

Circuit's opinion in Harris adds some precision:

A search or seizure of a person by a police
officer acting in the officer's noninvestigatory
capacity is reasonable if the "governmental interest
in the police officer's exercise of [his or her]
community caretaking function, based on specific
articulable facts, outweighs the individual's interest
in being free from arbitrary government interference."
Samuelson, 455 F.3d at 877 (quoting Winters, 254 F.3d
at 767 (Bye, J., concurring)); accord United States v.
Garner, 416 F.3d 1208, 1213 (10th Cir. 2005).  The
scope of the encounter must be carefully tailored to
satisfy the purpose of the initial detention, and the
police must allow the person to proceed once the
officer has completed the officer's inquiry, unless,
of course, the officer obtains further reason to
justify the stop.  See Garner, 416 F.3d at 1213; see
also United States v. Morgan, 729 F.3d 1086, 1091 (8th
Cir. 2013) ("While officers should employ the least
intrusive means reasonably available to verify or
dispel their suspicions, they may take any additional
steps that are 'reasonably necessary to protect their
personal safety ... during the course of the stop.'"
(alteration in original) (quoting United States v.
Hensley, 469 U.S. 221, 235 (1985))).

Harris, ___ F.3d at ___, 2014 WL 1356822, at *2.

### 2. Officer Hurley

No reasonable jury could find that Officer Hurley's

detention of Day was unreasonable.  It is undisputed that: (1)

KPD dispatchers informed Officer Hurley that Day was suffering

from a medical emergency and was threatening to run from the

ambulance that had been dispatched to the scene;[4] (2) just before
or just after Officer Hurley got to the scene, Day began yelling
at Martinez; (3) when Day saw Officer Hurley, she started
walking fast;[5] and (4) no more than one minute and fifty seconds
elapsed between Officer Hurley's arrival on the scene and his
transfer of Day to the custody of the paramedics.  Those are
"specific articulable facts," Harris, 2014 WL 1356822, at *2,
that compel a conclusion that the government's interest in
preventing Day from leaving the scene and getting her to the
ambulance outweighed Day's interest in being free from
government interference for the 110 seconds that elapsed between
Officer Hurley's arrival and his delivery of her to the

---

[4] Day makes much of her evidence that Martinez told the 911
operator that she would run from police, rather than from an
ambulance.  But, by the time that warning made its way from
Martinez to the 911 operator, from the 911 operator to KPD
dispatch, and from KPD dispatch to Officer Hurley, the warning
was that Day had threatened to run from the ambulance.  Because
the only facts relevant to the reasonableness analysis concern
what Officer Hurley reasonably believed when he arrived on the
scene, proof of what Martinez said to the 911 operator is of no
moment.

[5] Day devotes considerable attention to establishing that at
the time of her encounter with Officer Hurley, she was unable to
run.  But, as with evidence of what Martinez told the 911
operator, what matters here is not Day's ability to run, but,
rather what Officer Hurley had reason to believe when he made
the decision to detain her, and based upon what he was told by
KPD dispatch, Officer Hurley had good reason to believe that
when Day began to walk fast, she was attempting to get away from
the ambulance that Martinez had called for.

paramedics.  Moreover, the government had a strong interest in making sure that Day was not overly agitated when she was placed in the custody of the paramedics.  With respect to the scope of the encounter, its maximum duration is undisputed, as is the fact that Officer Hurley handed Day over to the paramedics as soon as she became calm enough to receive medical treatment.  No reasonable jury could conclude that Officer Hurley detained Day with no good reason for doing so, or for any longer than was necessary.[6]

According to Day, however, Hurley was not properly engaged in community caretaking when he detained her because the policies of the KPD, which incorporate various New Hampshire statutes, did not authorize detention under the circumstances of this case, which made the detention unreasonable per se.  The court does not agree.

The operative legal principle here is reasonableness, as described in Lockhart-Bembery, Rodriguez-Morales, and Harris.

---

[6] With regard to the duration of Day's detention, the court notes her insistence that when she began walking fast, she was walking toward the paramedics who had arrived on the scene. Given the undisputed fact that the paramedics arrived nearly a minute after Officer Hurley did, and that they began treating her just 52 seconds after they arrived, proof that Day was walking toward the paramedics when Officer Hurley detained her would also be proof that her detention lasted no longer than 52 seconds.  Under the applicable law, the shorter the detention, the more reasonable it was.

Reasonableness, in turn, is not so narrow a concept as Day understands it to be.  The Supreme Court's recognition of the community-caretaking function was based upon the infinite variety of public-safety services that police officers are called upon to provide.  See Rodriguez-Morales, 929 F.2d at 785. Thus, the fact that no state statute specifically anticipates some particular emergency situation and expressly authorizes police officers to detain people under those circumstances is not the last word on the constitutionality of Officer Hurley's detention of Day.  That is, the mere fact that neither KPD regulations nor the New Hampshire statutes explicitly provide for detention under the circumstances Officer Hurley faced does not make Officer Hurley's actions unreasonable under the federal common law, which is all that is necessary for those actions to have been constitutional.

To restate, Officer Hurley was told he was being dispatched to assist a woman with a medical emergency who had threatened to run from the ambulance that was also being dispatched, and when he got to the scene, he encountered a woman who appeared to be agitated and who started walking fast when she saw him.  Officer Hurley had an obligation to aid and protect both Day and the paramedics who had been sent to treat her.  No reasonable jury could find that it was unreasonable for Officer Hurley to

16

believe that Day might put herself in harm's way by trying to
get away from the ambulance or that her agitated state could
pose a danger to the paramedics.  Thus, no reasonable jury could
conclude that Officer Hurley stepped beyond the community-
caretaking function by detaining Day and turning her over to the
paramedics in a calmer condition than he found her in upon his
arrival.

Based upon the foregoing, Officer Hurley is entitled to
judgment as a matter of law on Day's claim that he violated her
rights under the Fourth Amendment by detaining her.

### 3. Officer Macie

Day also claims that Officer Macie violated her Fourth
Amendment rights.  Officer Macie argues that he is entitled to
summary judgment because there is no evidence that he had any
role in Day's detention.  Day concedes that Officer Macie never
touched her, but argues that he is a proper defendant because he
had an affirmative duty to protect her from Officer Hurley's
unconstitutional actions.

Given the court's determination that Officer Hurley did not
detain Day in violation of her Fourth Amendment rights, Officer
Macie is necessarily entitled to judgment as a matter of law on
Count II.  However, even if Officer Hurley had violated Day's

Fourth Amendment rights, Officer Macie would still be entitled to judgment as a matter of law on Count II.

For the legal proposition on which she relies to hold Officer Macie liable on the Fourth Amendment claim stated in Count II, Day relies upon Davis v. Rennie, 264 F.3d 86 (1st Cir. 2001). In that case, "an involuntarily committed mental patient[] brought suit under 42 U.S.C. § 1983 . . . against multiple defendants after being punched repeatedly in the head during a physical restraint at Westborough State Hospital." 264 F.3d at 91. In deciding Davis, the court of appeals pointed out that "[a]n officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force can be held liable under section 1983 for his nonfeasance." Id. at 98 (quoting Gaudreault v. Salem, 923 F.2d 203, 207 n.3 (1st Cir. 1990).

Davis and Gaudreault were both excessive-force cases, not unlawful-detention cases, and it is not clear that the rule from those cases extends to claims for unlawful detention. There is yet another problem with Day's reliance on Davis. That case involved a claim based upon substantive due process, see 264 F.3d at 97-98 ("[t]he strand of substantive due process jurisprudence primarily at issue here involves Davis's right to be free from the use of excessive force and the appellants'

18

failure to prevent that force"), and the court of appeals has characterized Gaudreault as a due-process case, see Martinez v. Colon, 54 F.3d 980, 985 (1st Cir. 1995).  Here, however, Day has not brought a due-process claim against Officer Macie; she claims that he violated her rights under the Fourth Amendment. Day's failure to assert a due-process claim, however, is of no moment because even if she had, it would fail, as a matter of law.

In Davis, the court of appeals approved the trial court's use of the following jury instructions:

> To prevail on this claim, Mr. Davis must establish by
> a preponderance of the evidence as to each [onlooker]
> defendant separately:
>
> 1) That [the onlooker] defendant was present at the
> scene of the alleged excessive use of force by Mr.
> Bragg at the time it occurred;
>
> 2) That [the onlooker] defendant actually observed the
> alleged excessive use of force by Mr. Bragg;
>
> 3) That [the onlooker] defendant was in a position
> where he or she could realistically prevent the
> alleged use of excessive force by Phillip Bragg; and
>
> 4) That there was sufficient time available to [the
> onlooker] defendant to prevent the alleged excessive
> use of force.  In sum . . . you must determine as to
> each [onlooker] defendant whether he or she actually
> knew of Mr. Bragg's alleged punching, whether he or
> she could have prevented it, whether there was enough
> time to do so, and whether he or she failed to do so.

264 F.3d at 97; see also Gaudreault, 923 F.2d at 207 n.3 ("A
police officer cannot be held liable for failing to intercede if
he has no 'realistic opportunity' to prevent an attack.")
(quoting O'Neill v. Krzeminski, 839 F.2d 9, 11-12 (2d Cir.
1988)).

On the facts of this case, a due-process claim would falter
on the factors of timing and ability to prevent or limit the
detention.  There is undisputed evidence that: (1) the detention
began part way into an encounter that lasted no more than two
minutes or, under Day's version of the facts, lasted less than
one minute; (2) at the point in the detention when Officer
Hurley placed Day in an arm bar, Officer Macie was in the
vicinity, "but not in the scene as of yet," Martinez Dep. 30:7;
(3) during the detention, Martinez was "badgering the officers
to leave [Day] alone," Martinez Dep. 44:9, which necessarily
occupied some of their attention and impaired their ability to
communicate with each other; (4) Day was non-cooperative during
some of the detention, and it took "a while" her to calm down,
which must also have occupied some of Officer Hurley's attention
and limited his ability to respond to anything Officer Macie
could have said to him; and (5) as soon as Day became calm,
Officer Hurley released her to the paramedics.  In short, given
the brevity of Day's detention and the various distractions

facing both officers, i.e., Day's agitation and lack of
cooperation plus Martinez's badgering, no reasonable jury could
conclude that Officer Macie had a realistic opportunity to
prevent or intervene in Day's detention.

Moving from the claim that Day should have brought to the
claim she actually did bring, there are circumstances under
which an officer who does not intervene may be held liable for a
Fourth Amendment violation:

> A constitutional duty to intervene may also arise
> if onlooker officers are instrumental in assisting the
> actual attacker to place the victim in a vulnerable
> position.  See, e.g., Byrd v. Brishke, 466 F.2d 6, 9-
> 11 (7th Cir. 1972); cf. DeShaney [v. Winnebago Cnty.
> Dep't of Soc. Servs.], 489 U.S. [189,] 201 [(1989)]
> (recognizing a possible affirmative constitutional
> duty to protect against certain dangers if the state
> takes "part in their creation" or does something "to
> render [the victim] more vulnerable to them").  In
> such a scenario, the onlooker officers and the
> aggressor officer are essentially joint tortfeasors
> and, therefore, may incur shared constitutional
> responsibility.  See generally Monroe v. Pape, 365
> U.S. 167, 187 (1961) (advising courts to read section
> 1983 against the backdrop of historical tort
> liability).

Martinez, 54 F.3d at 985 n.4 (parallel citations omitted).
Here, Day has produced no evidence to support a claim that Macie
did anything to help Officer Hurley detain Day or prolong her
detention past the point where it was reasonable to detain her.
Thus, there is no basis for a claim that Officer Macie bears
joint responsibility for Day's detention.

Given that the undisputed facts in this case fail to support either a due-process claim or a Fourth Amendment claim based upon Officer Macie's alleged failure to intervene, Day's oral motion to amend her complaint is denied as futile, and Officer Macie is entitled to judgment as a matter of law on Count II.

### B. Count I

In Count I, Day claims that Officers Hurley and Macie violated her Fourth Amendment rights by using excessive force against her.  Defendants argue that Officer Macie is entitled to summary judgment because it is undisputed that he did not use any force against Day.  They further argue that Officer Hurley is entitled to summary judgment because the amount of force he used against Day was objectively reasonable and that, even if Officer Hurley did violate Day's Fourth Amendment rights by using excessive force, he is protected by qualified immunity.

### 1. Relevant Law

The court begins with the legal principles that govern excessive-force claims.

> Excessive force claims are founded on the Fourth Amendment right to be free from unreasonable seizures of the person.  See U.S. Const. amend. IV; Graham v. Connor, 490 U.S. 386, 394–95 (1989).  The Fourth Amendment is implicated where an officer exceeds the

bounds of reasonable force in effecting an arrest or
investigatory stop.  See Graham, 490 U.S. at 394-95.

Raiche v. Pietroski, 623 F.3d 30, 36 (1st Cir. 2010) (parallel

citations omitted).

> "To establish a Fourth Amendment violation based on
> excessive force, a plaintiff must show that the
> defendant officer employed force that was unreasonable
> under the circumstances." Jennings v. Jones, 499 F.3d
> 2, 11 (1st Cir. 2007).  Courts assess the
> reasonableness of a particular use of force "from the
> perspective of a reasonable officer on the scene,
> rather than with the 20/20 vision of hindsight," and
> must account "for the fact that police officers are
> often forced to make split-second judgments — in
> circumstances that are tense, uncertain, and rapidly
> evolving — about the amount of force that is necessary
> in a particular situation." Graham v. Connor, 490
> U.S. 386, 396–97 (1989).

Kenney v. Floyd, 700 F.3d 604, 609 (1st Cir. 2012) (parallel

citations omitted).  In determining whether an officer's use of

force when making an arrest is reasonable under the

circumstances, courts must

> balance the individual's interest against the
> government's, weighing three non-exclusive factors:
> (1) "the severity of the crime at issue," (2) "whether
> the suspect poses an immediate threat to the safety of
> the officers or others," and (3) "whether [the
> suspect] is actively resisting arrest or attempting to
> evade arrest by flight."

Raiche, 623 F.3d at 36 (quoting Graham, 490 U.S. at 396; citing

Morelli, 552 F.3d at 23).

In reliance upon common sense, see Raiche, 623 F.3d at 37

n.2 (suggesting the value of common sense in excessive-force

analysis), Day mounts a multi-pronged attack on the
reasonableness of the force that Officer Hurley applied to her.
Specifically, she argues that: (1) she neither committed any
crime nor was suspected of doing so; (2) she did not pose a
threat to anyone; (3) she did not run away from Officers Hurley
and Macie but walked toward the ambulance; (4) Edwin called for
medical assistance, not police assistance; (5) Officers Hurley
and Macie were told that Day was suffering from an asthma and/or
anxiety attack; (6) Day did not raise her arms or otherwise
threaten to hit Officer Hurley; and (7) she could not have been
resisting him because he had not yet detained her when she was
walking to the ambulance.  Day concludes: "[T]he facts, framed
in the light most favorable to Casandra show her waiting for the
ambulance, quickly walking toward it when it arrived, and then
being attacked, placed in an arm-bar, and slammed against the
trunk of a police cruiser for no reason."  Pl.'s Mem. of Law
(doc. no. 21) 11.

        The central problem with Day's argument is that relatively
little of it takes the perspective of a reasonable officer on
the scene.  For example, while Day relies upon her own
deposition testimony along with Martinez's to establish that she
never made a fist or took a swing at Officer Hurley, the
relevant question is not whether she took a swing at Officer

                                24

Hurley but, rather, what a reasonable officer in Officer
Hurley's position would have thought was happening during his
encounter with Day.  That said, the court turns to the claims
against each of the two officers.

### 2. Officer Hurley

Based upon the undisputed factual record, no reasonable
jury could conclude that it was unreasonable for Officer Hurley
to think that Day posed a threat to him, or to the paramedics,
when he placed her in an arm bar and placed her on the trunk of
the cruiser.  It is undisputed that shortly before or after
Officer Hurley arrived on the scene, Day was agitated and
yelling at Martinez.  And Day herself has produced testimony
from Martinez that he saw her "flailing her arms at the police
officer [i.e., Officer Hurley]."  Martinez Dep. 50:9 (emphasis
added).  Given the warning Officer Hurley was given regarding
Day's threat to flee, the agitated conversation she had with
Martinez, and the fact that Officer Hurley saw her start walking
fast when she saw him, it was not unreasonable for Officer
Hurley to feel threatened when Day began flailing her arms at
him, and it was not unreasonable for him to take the actions he
did to protect himself.

In terms of the three non-exclusive factors described in Raiche, modified to apply to a community-caretaking detention, rather than an arrest, the balance favors Officer Hurley. First, the fact that an ambulance had been dispatched suggests that Day was suffering from a severe enough medical condition to justify taking significant action to keep her from fleeing and to ensure that the paramedics could begin treating her as soon as possible.  As to the second factor, whether Day actually made a fist or took a swing at Officer Hurley, the undisputed fact that she was flailing her arms at him posed an immediate, if minor, threat to him and to anybody else in close proximity to her.  Moreover, her state of agitation made it unsafe for the paramedics to attend to her until she calmed down.  Finally, while Day argues that she was cooperative with Officer Hurley, her own deposition testimony, and that of Martinez, establishes exactly the opposite proposition, i.e., that up until the point at which Officer Hurley released her, she had not been submissive.  Based upon the foregoing, no reasonable jury could conclude that it was unreasonable for Officer Hurley to use some amount of force to keep Day from fleeing and to protect himself and the paramedics.

Beyond that, given the deference that must be afforded to decisions made by police officers in rapidly evolving

situations, such as the one that faced Officer Hurley, no reasonable jury could conclude that Officer Hurley used too much force on Day.  She was flailing her arms at him, and he immobilized one of her arms, and placed her in a position that precluded her from effectively using her other one.[7]  She was unarmed, and he used no weapon.  Officer Hurley released Day as soon as she submitted to him, and he did not maintain physical control of her for any more than two minutes.  As a matter of law, the amount of force Officer Hurley used was not excessive, which entitles him to judgment as a matter of law on Count I.

### 3. Officer Macie

Everything the court has said with respect to Officer Macie's liability under Count II applies with equal force to Count I, which entitles Officer Macie to judgment as a matter of law on the excessive-force claim stated therein.

---

[7] Day describes Officer Hurley's final use of force as "slam[ing] her face first into the back of [a] cruiser." Martinez Dep. 29:6; see also Day Dep. 45:10-11.  But that description is somewhat difficult to square with the photographs Day submitted in support of her objection to summary judgment. See Pl.'s Sealed Mem. of Law, Ex. 2 (doc. no. 13-3).  Only three of the five photographs show Day's face at all, and only one of them shows her full face.  And, notwithstanding the deposition testimony that she bruises easily, and the fact that the photographs do show bruises on her arms, they do not appear to show any bruising on her face, which tends to undermine her testimony about the amount of force Officer Hurley applied when he placed her on the trunk of a cruiser.

C. Count III & IV

In Counts III and IV, in reliance upon legal principles established in Monell v. Department of Social Services, 436 U.S. 658 (1978), Day claims that Chief Meola and the Town are liable to her for negligently training and/or supervising Officers Hurley and Macie, which resulted in their violating her constitutional rights.  However, as explained above, neither Officer Hurley nor Officer Macie violated any of Day's constitutional rights.  Thus, her Monell claims must also fail because "a municipality cannot be held liable for the actions of its officials under Monell if those actions 'inflicted no constitutional harm.'"  Gianfrancesco v. Town of Wrentham, 712 F.3d 634, 640 n. 4 (1st Cir. 2013) (quoting Robinson v. Cook, 706 F.3d 25, 38 (1st Cir. 2013); City of L.A. v. Heller, 475 U.S. 796, 799 (1986)).  Accordingly, Chief Meola and the Town are entitled to judgment as a matter of law on Counts III and IV.

D. State-Law Claims

Day claims that Officers Hurley and Macie are liable to her for the common-law torts of: assault (Count V), battery (Count VI), intentional infliction of emotional distress (Count VII), and false imprisonment (Count X).  Counts VIII and IX assert that Chief Meola and the Town are vicariously liable for the

28

conduct on which Counts V-VII and X are based.  Defendants ask
the court to decline to exercise supplemental jurisdiction over
Day's state-law claims, in the event it grants them summary
judgment on Counts I-IV.  In the alternative, defendants argue
that: (1) Officers Hurley and Macie are entitled to summary
judgment on Counts V-VII and X because the amount of force
Officer Hurley used was justified under N.H. Rev. Stat. Ann.
("RSA") § 627:5; (2) the officers are entitled to summary
judgment on Counts V-VII under the doctrine of official
immunity; and (3) the officers are entitled to summary judgment
on Counts V-VII and X under the doctrine of statutory immunity,
as established by RSA 507-B:5.  Defendants do not specifically
address Counts VIII and IX.

### 1. Counts V-VII & X

In New Hampshire, "[n]o governmental unit shall be held
liable in any action to recover for bodily injury, personal
injury or property damage except as provided by [RSA 507-B] or
as is provided or may be provided by other statute."  RSA 507-
B:5.  The New Hampshire Supreme Court has construed RSA 507-B:5
as conferring immunity upon governmental units, see Dichiara v.
Sanborn Reg'l Sch. Dist., ___ N.H. ___, ___, 82 A.3d 225, 227
(2013), and that immunity extends to present and former

employees of governmental units who were "acting within the scope of [their] office[s] and in good faith," RSA 507-B:4, IV.

Day's battery claim is plainly an "[a]ction to recover for bodily injury," RSA 507-B:1, II, and false imprisonment is specifically identified in RSA 507-B:1, III(a), as a personal-injury claim.  Moreover, there can be no question that assault and intentional infliction of emotional distress qualify as injuries to the feelings of a natural person, which means that claims under those theories are claims for personal injury.  See RSA 507-B:1, III(a) (defining "personal injury" for purposes of RSA 507-B).  Thus, the immunity afforded by RSA 507-B:5 covers all of the claims stated in Counts V-VII and X.

To counter defendants' reliance upon RSA 507-B:5, Day argues that immunity is not available to Officers Hurley and Macie because they were not acting in good faith when they subjected her to tortious conduct.[8]  Her argument is not persuasive.

_____

[8] As for Officer Macie, there are no factual allegations in the complaint that link him to any conduct amounting to assault, battery, or false imprisonment, and only the barest allegations of conduct that might support a claim for intentional infliction of emotional distress, see Compl. (doc. no. 1) ¶¶ 19-21.  In her memorandum of law, the only conduct by Officer Macie that Day mentions in her discussion of RSA 507-B:5 is his alleged failure "to stop the Constitutional violations."  Pl.'s Mem. of Law (doc. no 21) 20.  She does not, however, explain how that conduct qualifies as tortious under the common law of New Hampshire.

    With regard to good faith, Judge DiClerico recently pointed
out that RSA 507-B "does not define 'good faith,' and the New
Hampshire Supreme Court has not addressed the meaning of 'good
faith' for purposes of RSA 507-B:4, IV, in a published
decision." Holm v. Town of Derry, No. 11-cv-32-JD, 2011 WL
6371792, at *3 (D.N.H. Dec. 20, 2011).  With regard to an
authoritative definition of "good faith," nothing seems to have
changed since Judge DiClerico issued his order in Holm.

    In Holm, Judge DiClerico turned to Cannata v. Town of
Deerfield, 132 N.H. 235 (1989) for a definition of good faith.
Cannata involved a different immunity statute, which provided
"that no municipal executives, specified in the statute, 'shall
be held liable for civil damages for any vote, resolution, or
decision made by said person acting in his or her official
capacity in good faith and within the scope of his or her
authority.'" Holm, 2011 WL 6371792, at *3 (quoting RSA 31:104).
As Judge DiClerico wrote: "The court [in Cannata] concluded that
the plaintiffs' conclusory references to wanton conduct by the
selectmen did not obviate the protection provided under RSA
31:104." Id. (internal quotation marks omitted).

    Here, Counts VII (intentional infliction of emotional
distress) and X (false imprisonment) do not even go so far as to
make conclusory references to wanton conduct.  Counts V and VI

do allege, in a conclusory fashion, that the conduct of Officers
Hurley and Macie was "willful and wanton," Compl. (doc. no. 1)
¶¶ 49, 52, but otherwise, Counts V and VI do little if anything
more than recite the elements of the causes of action they
assert, a pleading strategy that is most assuredly disfavored,
see Rodríguez-Vives v. P.R. Firefighters Corps, 743 F.3d 278,
283 (1st Cir. 2014) ("A complaint must contain more than a rote
recital of the elements of a cause of action . . . .") (citation
and internal quotation marks omitted).  That is, the complaint
does not allege any specific conduct that satisfies the elements
of the causes of action, much less allege conduct that was not
just unlawful, but also wanton or willful.

   Moreover, in her objection to summary judgment, Day says
nothing more about good faith than this:

> As discussed above, Hurley detained Casandra without
> any evidence that she posed a threat to herself or
> anyone else.  Additionally, grabbing her, placing her
> in an arm bar, and slamming her face into the back of
> the police cruiser does not evidence good faith.
> Macie did nothing to stop the Constitutional
> violations.  Therefore, RSA § 507-B does not shield
> either from liability.

Pl.'s Mem. of Law (doc. no. 21) 20.

   While Day points out the conduct that underlies her
substantive claim, she points to no evidence that could support
an argument that either Officer Hurley or Officer Macie acted in

32

anything but good faith.  As the court has already determined,
it was reasonable for Officer Hurley to believe that Day posed a
threat to herself, based upon her threat to run from the
ambulance, and it was reasonable for him to believe that she
posed a threat to others, based upon her agitation and the way
in which she was flailing her arms.  In the face of those
threats, he used a minimal amount of force for a brief time,
brought Day under control, and quickly handed her over to the
paramedics for the medical care that had been requested on her
behalf.  No reasonable jury could find even a hint of anything
but good faith in the undisputed facts of this case.
Accordingly, Officers Hurley and Macie are entitled to the
protection of RSA 507-B:5.  Because they are immune to Day's
state-law claims, Officers Hurley and Macie are entitled to
judgment as a matter of law on Counts V-VII and X.

### 2. Counts VIII & IX

Because Officers Hurley and Macie are entitled to judgment
as a matter of law on the claims asserted in Counts V-VII and X,
there is no tortious conduct for which either Chief Meola or the
Town could be vicariously liable.  Accordingly, those defendants
are entitled to judgment as a matter of law on Counts VIII and
IX.

**Conclusion**

For the reasons detailed above, all four defendants are entitled to judgment as a matter of law on all of the claims Day has asserted against them.  Thus, their motion for summary judgment, document no. 12, is granted.  The clerk of the court shall enter judgment in accordance with this order and close the case.

SO ORDERED.

_____
Landya McCafferty
United States District Judge

May 6, 2014

cc:  Charles P. Bauer, Esq.
     Robert Joseph Dietel, Esq.
     Stephen T. Martin, Esq.